Daniel R. Levy, Esquire
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
(973) 642-1900 (phone)
(973) 642-0099 (fax)
dlevy@ebglaw.com
Counsel for Plaintiff,
*Becton Dickinson and Company*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BECTON, DICKINSON AND COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> BRANDON HANTLE, <br><br> Defendant. | Civil Action No. <br><br> **VERIFIED COMPLAINT** |

Plaintiff, BECTON, DICKINSON AND COMPANY ("BD" or the "Company"), by and through its undersigned counsel, files this Verified Complaint against Defendant, BRANDON HANTLE ("Hantle" or "Defendant"), and in support thereof avers as follows:

1.     This action arises out of the conduct of Defendant Hantle, a former BD employee who recently resigned from BD to join Innovation Associates, Inc. ("iA"),

BD's direct competitor in the provision of pharmacy automation solutions. Over the course of his employment, Hantle, who was most recently employed by BD as its Area Sales Director, had access to BD's highly confidential and proprietary pricing strategies and strategic investment priorities. Hantle also had access to BD trade secrets and confidential and proprietary information related to BD's pharmacy automation solutions, including strategic plans, pricing structures, customer lists, margin targets, and customer data, including the full BD pipeline for pharmacy automation solutions for BD's West Region. The confidential and proprietary information that Hantle was provided access would be invaluable to BD's competitors, particularly iA.

2.      In seeking to enforce its restrictive covenants, BD seeks to stop Hantle from working in a role at iA in essentially the same position to the one he held at BD, namely in a role in which he has responsibility for pricing and competitive analysis of pharmacy automation products. In addition to seeking to enforce Hantle's non-compete covenant, BD also seeks to stop Hantle from violating his customer non-solicit and employee non-solicit, both of which he has already violated in the short time that he has been employed at iA.

3.      Hantle's decision to accept employment with iA is a brazen violation of his restrictive covenant agreement to refrain from providing services for a BD competitor for a period of one year after resigning from BD.

4.      Even more concerning to BD is that Hantle possesses BD's confidential information and trade secrets, and despite informing BD that he had returned all BD property and information, Hantle continues to possess confidential pricing and business documents of BD, which he is poised to use and/or disclose if he is permitted to continue his employment with iA.

5.      Furthermore, at the time of his resignation from BD, Hantle misrepresented to BD that he had accepted a position that was not competitive to BD, suggesting to BD that his new employment would not violate his restrictive covenant obligations.  Even after he left BD's employ, Hantle continued to misrepresent to his former manager that he had not joined a competitor of BD.  BD only recently learned that Hantle had, in fact, accepted an employment offer with iA and is currently employed by iA as its Senior Vice President, Sales, and is a member of iA's Leadership Team.

6.      Moreover, in the days leading up to his voluntary resignation from BD, Hantle misappropriated BD trade secrets and confidential information by transferring files from his BD e-mail account to his personal e-mail account. Specifically, only two days before tendering his resignation, Hantle forwarded to his personal e-mail account files containing BD's sales information, confidential customer information, business plans, and sales processes.

7.    In one instance, Hantle developed a PowerPoint presentation of what appears to be a company that he has formed, or intends to form (in violation of his non-compete), but pilfered BD confidential information and inserted the information into the PowerPoint in an effort to make the PowerPoint to appear that it was owned by his new company.

8.    One of the PowerPoint slides provides direct evidence that the information is owned by BD because it still maintains BD's designation of "BD Restricted", meaning that the information is owned by BD and should only be used for the benefit of BD.

9.    Hantle has already commenced with his plan to improperly compete with BD in violation of his contractual and legal obligations to BD.  BD has learned that Hantle has already, in violation of his restrictive covenant, been soliciting BD employees to leave their employment with BD and join iA.

10.    BD has also learned that Hantle has stated his intention to violate his customer non-solicit restrictive covenant as he intends to "take all the Health System business from Parata."  He is already armed with BD's trade secrets and confidential information that he misappropriated from BD before his departure in order to effectuate his intentions of unfairly competing with BD as an employee of iA.

11.    Hantle's violation of the restrictive covenant and his misappropriation of BD trade secrets and confidential information will cause BD to suffer substantial

economic damages, as well as irreparable harm that cannot be remedied by money damages alone. Accordingly, BD commenced this action to recover all losses caused by Hantle's unlawful conduct, including equitable relief to prevent Hantle from continuing to violate his restrictive covenant by continuing employment with a direct competitor of BD and utilizing BD's confidential information, causing BD to suffer further irreparable harm.

## **PARTIES**

12.    BD is a corporation duly organized under the laws of the State of New Jersey, and maintains its principal place of business at One Becton Drive, Franklin Lakes, New Jersey 07417. Thus, BD is a citizen of New Jersey.

13.    BD is a global medical technology company that serves healthcare institutions, life science researchers, clinical laboratories, the pharmaceutical industry and the general public.

14.    BD manufactures and sells a broad range of medical supplies, devices, laboratory equipment, and diagnostic products. BD has offices in approximately 50 countries worldwide.

15.    Hantle is an individual currently residing in the State of Colorado.

16.    In or about May 2018, Hantle was hired by The Chudy Group, LLC, d/b/a TCGRx ("TCGRx") as Vice President, Health Systems.

17.    Hantle executed an offer letter confirming his acceptance of employment with TCGRx and agreeing that as a condition of his employment with TCGRx, he was required to sign an Employee Confidentiality and Assignment Agreement, "which includes a one year post-employment non-competition and non-solicitation covenant."

18.    On or about December 3, 2018, TCGRx merged with Parata Systems, LLC ("Parata" or "Parata Systems"), and after the merger, the combined company operated "under the Parata Systems brand" and was headquartered in Durham, North Carolina.    (*See*    https://parata.com/whats-new/news/tcgrx-parata-merge-create-pharmacy-automation-leader/).

19.    As a result of the merger between TCGRx and Parata, Hantle became an employee of Parata.

20.    On or about July 18, 2022, BD completed its acquisition of Parata pursuant to the terms of its previously announced plan of merger.

21.    Pursuant to the acquisition, Parata and TCGRx became wholly owned subsidiaries of BD, and therefore, BD welcomed both Parata's and TCGRx's products into the BD family of products.    BD and Parara/TCGRx are sometimes collectively referred to as the "Company".

22.    Following BD's acquisition of Parata, Hantle became a BD employee.

23.     Hantle most recently held the position of Area Sales Director, Parata within BD's pharmacy automation division of its Medication Management Solutions ("MMS") business.

24.     As an Area Sales Director within BD's MMS business, Hantle was assigned to BD's Durham, North Carolina office and primarily worked in field locations and customer sites across the United States, as well as out of his home in Colorado.

## JURISDICTION AND VENUE

25.     Jurisdiction is based on 28 U.S.C. § 1331 and BD's claims under 18 U.S.C. 1836(b), for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016.

26.     Jurisdiction is also based upon 28 U.S.C. § 1332(a)(2) in that there is complete diversity of citizenship between the parties as BD is a citizen of New Jersey and Hantle is a citizen of Colorado, and the amount in controversy exceeds $75,000.00.

27.     The amount in controversy in this action exceeds $75,000 as Hantle received well in excess of $75,000 in salary and other compensation from the Company in exchange for his promise not to compete, and BD will suffer irreparable harm should he breach that promise.

28.    This Court has supplemental jurisdiction pursuant to 28 U.S.C § 1367 of all other claims that do not arise under the Constitution, laws, or treaties of the United States.

29.    This Court has personal jurisdiction over Hantle because Hantle's actions of taking BD's confidential information, and breaching his obligations to BD were directed at BD in New Jersey, and these purposeful actions constitute at least minimum contact with New Jersey such that the maintenance of this suit in this Court does not offend traditional notions of fair play and substantial justice.

30.    Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to BD's claim occurred in this judicial district.

## FACTS

### A.    Hantle's Employment with BD

31.    Hantle was hired by TCGRx in 2018, and he became a BD employee in or about 2022 following BD's acquisition of TCGRx and Parata.

32.    At the time BD acquired Parata through December 2023, Hantle was employed as Vice President, Sales.  As Vice President, Sales, Hantle had responsibility for sales and BD's full pipeline for pharmacy automation for the entire United States, including all customers located in New Jersey.

33.    In or about December 2023, BD transitioned Hantle from Vice President, Sales to Area Sales Director.  Although this was a title change to reflect

the organizational structure within BD, Hantle was displeased with the change in title.

34.    Hantle continued to work for BD as an Area Sales Director from December 2023 until he gave BD two weeks' notice of his resignation January 22, 2025, and his last day of employment with BD was February 6, 2025.

35.    On April 25, 2018, Hantle executed the Employee Confidentiality and Assignment Agreement (the "Agreement").   A true copy of the Agreement is attached hereto as Exhibit 1.

36.    According to Hantle's Agreement, he agreed that "all information, whether or not in writing, concerning the Company's business, technology, business relationships or financial affairs which the Company has not released to the general public (collectively, 'Proprietary Information') is and will be the exclusive property of the Company."  (Exhibit 1, at ¶ 1).

37.    The Agreement includes multiple examples of Proprietary Information, including "*financial information*," which is defined as "cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists[.]"  (*Id.* at ¶ 1(c)).

38.    Proprietary Information also includes "*marketing information*," which includes "strategies, methods, customer identities" as well as "market analyses or projections[.]"  (*Id.* at ¶ 1(b)).

9

39.    Hantle specifically agreed that he would "not, at any time, without the Company's prior written permission, either during or after my employment, disclose any Proprietary Information to anyone outside of the Company, or use or permit to be used any Proprietary Information for any purpose" other than for performing his duties for the Company.  (*Id.* at ¶ 2).

40.    Hantle also agreed that he would return to the Company all copies of Proprietary Information in his possession or control upon termination of his employment with the Company.  (*See id.*)

41.    In addition to his confidentiality obligations to the Company, Hantle also agreed to a one-year non-compete and non-solicit.  (*See id.* at ¶ 8).

42.    Hantle agreed that, in order to protect the Company's Proprietary Information and good will, that for a period of one year following the termination of his employment, he would not accept employment with any business anywhere within the United States "that develops, manufactures or markets any products, or performs any services, that are otherwise competitive with or similar to the products or services of the Company[.]"  (*Id.*)

43.     Hantle also agreed that, in order to protect the Company's Proprietary Information and good will, that for a period of one year following the termination of his employment, he would not "call upon, solicit, divert, take away, accept or

conduct any business from or with any of the customers or prospective customers of the Company or any of its suppliers[.]" (*Id.*)

44.    Hantle also agreed not to solicit any employee or consultant of the Company to leave the Company, or to participate in or facilitate the hire of any person who is employed or engaged by the Company. (*Id.*).

45.    Hantle agreed any breach of the Agreement by him would cause the Company to suffer "substantial and irrevocable damage" and that in the event of a breach of the Agreement, "the Company, in addition to such other remedies which may be available, will be entitled to specific performance and other injunctive relief, without the posting of a bond." (*Id.* at ¶ 10).

46.    Hantle agreed that in the event of a breach of the Agreement, he is "obligated to pay all the Company's costs of enforcement of this Agreement, including attorneys' fees and expenses." (*Id.*).

47.    The terms of the Agreement apply to TCGRx and "any of its affiliates[,]" including its "successors", such as BD. (*Id.* at Preamble).

48.    Hantle agreed that his obligations under the Agreement will continue following his termination for any reason and that the terms of the Agreement would apply to TCGRx's successors, such as BD. (*Id.* ¶ 14).

49.    Pursuant to the Agreement, Hantle agreed that he would attend an exit interview when departing the Company and that he would notify the Company "of

each subsequent employment or business activity, including the name and address of my employer or other post-Company employment plans and the nature of my activities." (*Id.* at ¶ 15).

50.    Hantle agreed that the Agreement would be interpreted and governed by the laws of the State of New York. (*Id.* at ¶ 18).

51.    In addition to the Agreement, Hantle also acknowledged that he would comply with the BD Trade Secret Policy.

52.    The BD Trade Secret Policy defines BD trade secrets as any information that derives independent economic value because it is not generally known to and not readily ascertained by proper means by the public, and it is subjected to reasonable measures to protect its secrecy.

53.    As stated in the Trade Secret Policy, examples of trade secrets include, but are not limited to, "sales information such as forecasts, promotional plans, call reports, competitive intelligence, or proprietary customer information (e.g., customer lists, pricing information; customer needs)[.]"

54.    Trade secrets also include "marketing information such as promotional plans, market studies or reports[.]"

55.    On or about November 20, 2024, Hantle completed BD's online training course relative to the BD Trade Secret Policy, during which Hantle acknowledged that he would comply with the BD Trade Secret Policy.

56.    Hantle also completed other online training regarding the protection of BD trade secrets and intellectual property through BD's annual web-based security and confidentiality training (known internally at BD as "C2C" training), including but not limited to completing C2C training on the BD Code of Conduct in May 2023, December 2023, and November 2024.

57.    As an Area Sales Director, Hantle had responsibility for building relationships with pharmacy leadership with decision-making authority across all of BD's pharmacy automation solutions business.  In that role, Hantle was involved in confidential internal discussions and meetings around strategic plans, pricing structures, BD MMS/Parata Roadmap (innovation), including pharmacy automation solutions that are not yet released to the public.

58.    Hantle had responsibility for relationships with certain BD customers, including BD's customers primarily located in the West region that Hantle led, including those in the Western and Central United States such as Arizona, California, Colorado, Kansas, Missouri, Michigan, Montana, Nevada, Oregon, Texas, Utah, Washington, and others.  At times, Hantle also worked across all states and worked with BD's customers in the Eastern Region, including customers located in New Jersey.

59.    As an Area Sales Director, Hantle had primary responsibility for pharmacy automation sales in acute care hospitals and Integrated Delivery Networks (IDNs), as well as building and implementing comprehensive sales strategies.

60.    As an Area Sales Director, Hantle had responsibility for BD's confidential pricing metrics, pricing methods, and tiered pricing and had access to BD's MMS & Parata Roadmap.

61.    Many of the contracts entered into between BD and its customers are for several years, and, therefore, BD's pricing information, of which Hantle has intimate knowledge, remains relevant for several years.

62.    Hantle also had responsibility for negotiating contractual renewals with customers, and, therefore, he possesses intimate knowledge about concessions that BD has made to its customers in the pharmacy automation solutions space.

63.    In his role as Area Sales Director, Hantle worked directly with customers and potential customers in which those potential customers were also considering iA's pharmacy automation solutions products.

64.    As an Area Sales Director, Hantle was responsible for understanding all aspects of BD's pharmacy automation solutions products and communicating with the sales team regarding the relative strengths and weaknesses of those products as compared to competitive products, including, specifically, iA's pharmacy automation solutions products.

65.     Thus, Hantle had intimate knowledge of BD's strategies to compete against iA in the pharmacy automation solutions space, including but not limited to live price quotes, competitive intelligence and the BD MMS and Parata Roadmap, and BD's technology and capabilities.

66.     Indeed, Hantle was provided with highly confidential pricing strategies, including live pricing quotes for currently pending customers who are actively deciding between BD and iA products, for BD's pharmacy automations solutions products in order to compete directly with iA.

67.     In addition to the above confidential information, Hantle participated in the development of BD's pricing and cost structure strategies for its pharmacy automation products throughout the entire United States.

68.     As part of Hantle's responsibilities for cost structure strategies, Hantle actively participated in multiple strategy calls for each deal, including strategizing as to value-add across BD's other business, including how BD could enhance value through other BD solutions.

69.     Hantle is also aware of technological disparities in BD's pharmacy automation solutions products and BD's confidential concession strategies for addressing these disparities with BD's customers. Hantle is poised to use this information to the detriment of BD, particularly if he is permitted to continue work in his role as Vice President of Sales for iA.

70.    Moreover, Hantle had responsibility for developing confidential discounting strategies and models, as well as concession strategies aimed at retaining customers and not losing those customers' business to competitors such as iA.

71.    Hantle's LinkedIn profile confirms these responsibilities by stating that he worked on the "largest flagship hospital / accounts" and that he "implemented" a comprehensive "sales strategy" for hospital agreements and helped BD "strategically accelerate complex sales processes."  A copy of Hantle's publicly available LinkedIn profile is attached hereto as Exhibit 2.

72.    In connection with Hantle's employment, BD issued a laptop computer to Hantle and provided him access to BD's network files.

73.    Thus, Hantle had access to confidential BD MMS information contained on the BD network and in BD proprietary databases, including but not limited to, pricing information, sales opportunities, names and contact information for BD's customers, active customer projects, competitive intelligence, and other confidential customer information.

74.    Hantle also had access to BD's confidential information including the full BD pipeline for pharmacy automation solutions in BD's West Region, which includes currently pending deals across 31 states.  In his role as Sales Director and because he participated in the development of BD's pricing and cost structure strategies for its pharmacy automation products throughout the entire United States,

Hantle also had access to the BD pipeline for pharmacy automation solutions in BD's East Region.

75.    At the time of his departure from BD, Hantle was actively working on more than 250 customers and potential customer transactions in the West Region pipeline, with an estimated value of more than $30 million.  In all, Hantle had access to more than 300 customers and potential customer transactions in the West Region pipeline, with an estimated value of more than $150 million.

76.    Hantle also had access to more than 325 customers and potential customer transactions in the East Region pipeline, with an estimated value of more than $100 million.

**B.    BD's Services And the Relevant Market**

77.    BD is among the world's leading suppliers of medical devices and a leading innovator in injection – and infusion-based drug delivery since 1906, when the Company built the first-ever facility in the U.S. to manufacture needles and syringes.

78.    BD is focused on improving drug delivery, enhancing the quality and speed of diagnosing infectious diseases and cancers, and advancing research, discovery and production of new drugs and vaccines.

79.    BD's capabilities are instrumental in combating many of the world's most pressing diseases.

80.    Founded in 1897 and headquartered in Franklin Lakes, New Jersey, BD employs approximately 69,000 associates in approximately 50 countries throughout the world.

81.    Through its BD Medical segment, and more specifically its Medication Management Solutions ("MMS") business, BD provides Medication Management technology serving acute care hospitals, non-acute care facilities, and retail pharmacies, including but not limited to, infusion pumps, and other automated medication dispensing systems.  Through the MMS business, BD also provides logistics software to acute and non-acute care hospitals that help track medications, simplify workflows, improve productivity and reduce medication cost and waste.

82.    Within the MMS business is BD's portfolio of innovative pharmacy automation solutions, including a growing network of pharmacies to reduce costs, enhance patient safety and improve the patient experience through intelligent workflow solutions.

83.    BD's pharmacy automation solutions have revolutionized the way healthcare providers can dispense, manage, and administer medications.

84.    BD's advancements through robotics, artificial intelligence, and digital health solutions have all provided recent and cutting-edge developments in the pharmacy automation solutions market that allow healthcare providers and hospital

systems the ability to streamline the medication dispensing processes, reduce medication errors, and optimize inventory management.

85.    BD's pharmacy automation solutions play a critical role in ensuring health care providers' compliance with regulatory standards for the dispensing of medications, and also play an invaluable role in facilitating medication reconciliation, and improving overall operational efficiency in pharmacies and healthcare facilities.

86.    Through the use of BD's automation and advanced software, pharmacists can focus more of their time on higher value clinical work and patient interactions to help improve medication adherence, medication safety and patient outcomes.

87.    The pharmacy automation solutions market is highly competitive.

**C.    BD's Pharmacy Automation Solutions Products and Trade Secrets**

88.    BD treats its pricing information and sales data for the MMS business, including its pharmacy automation solutions as trade secret information.

89.    BD also treats the sales, pricing, customer lists, future potential sales, competitive intelligence, and roadmaps for its pharmacy automation solutions products as trade secret information.

90.    BD's confidential and proprietary information, including trade secret information, is not generally known outside of BD, and the information contained in

those confidential and proprietary files is not readily ascertainable from any source of public information.

91.    BD's competitive position rests on the confidentiality of its pricing information, competitive intelligence, and plans to innovate within a highly competitive field.

**D.    BD's Efforts to Protect Its Confidential Information**

92.    As part of that protection of confidentiality, BD has in place policies, procedures and systems that protect its information from disclosure to others and from use by any one for purposes other than BD's interest.  TCGRx's and Parata's processes were generally consistent with the steps of BD.

93.    The Company requires employees to sign, as a condition of their employment, an employee agreement, pursuant to which each Company employee agrees to refrain from disclosing any confidential information to third parties and from using any such information for personal purposes.

94.    Further, BD has policies and procedures concerning information and data security that state, in relevant part, that only the software provided and installed by BD was allowed on employee computers, and that data and information on the BD Information System Network are proprietary and confidential.

95.    BD employees are reminded of these policies when they sign into the BD system as reflected in messages such as this one:

**You are about to enter a private network intended for the authorized use of Becton, Dickinson and Company and its affiliates ("BD") for business purposes. You may come into contact with information considered by BD policy as Restricted or Confidential, including Personal Health Information (PHI) or Personally Identifiable Information (PII) as well as data defined as Controlled Unclassified Information (CUI), Federal Contract Information (FCI) or Export Controlled information as specified by the US Government. In doing so, you affirm consent to the following: The actual or attempted unauthorized access, use, or modification of this network and/or data is prohibited by BD. Unauthorized users and/or unauthorized use may be subject to BD disciplinary proceedings and/or criminal and civil penalties in accordance with applicable law. The use of this system may be monitored and/or recorded for administrative, audit and security reasons in accordance with applicable law and policies. If such monitoring and/or recording reveals possible evidence of criminal activity, BD may provide the monitored evidence of such activity to law enforcement officials. Authorized use of this network is subject to BD policies, procedures and standards including the BD Acceptable Use Policy.**

96.    BD regularly reminds employees of the confidential and proprietary nature of its sales and pricing information by, among other things, requiring employees, including Hantle, to participate in its annual C2C training.

97.    Further, BD restricts physical access to its headquarters and other facilities by, among other things, requiring visitors to register with security and obtain authorization from BD facilities to enter the facilities and preventing guests to any BD facility, including its facilities in Durham, North Carolina, to venture unescorted into such secure areas or to access BD's confidential information unless

they or their employer had executed appropriate non-disclosure agreements with BD.

98.    BD also restricts access to its computer systems, by, among other things, maintaining advanced computer security systems and requiring the entry of a username and password to gain access to BD's computer system, which includes trade secrets, confidential, and proprietary information.

99.    Further, to the extent that confidential information exists in written paper form, such writings are kept in secured areas with limited access.

100.    Additionally, BD has in place electronic systems that monitor activity such as the downloading of files and information from BD's networks or computers to portable devices, personal e-mail accounts, or to cloud storage services such as Dropbox or iCloud.

101.    One of those security measures is a tool known as Data Loss Prevention on the laptops and desktops provided to BD associates, which develops a report that contains the date, time, type of device, file name, among other fields in which any BD employee electronically transfers information via e-mail or to another storage device, such as an USB removable media.

102.    BD's Information Security Department actively monitors the Data Loss Prevention platform in an effort to determine whether BD employees are downloading or otherwise transferring BD trade secrets or confidential information.

103.   In addition, BD maintains a Code of Conduct that includes the requirement to protect BD information and requiring all associates to participate in training each year.

104.   Hantle last completed such training in November 2024.

105.   The Code of Conduct states: "All directors, officers and employees are responsible for complying with the Code" as a condition of employment with BD.

106.   The Code prohibits BD employees from, among other things, using BD Information Technologies to engage in the unauthorized access to data, using "personal email or file services to conduct BD business[,]" downloading or installing software that is not approved by BD, or using "hostage or storage services that have not been approved by BD Information Security[.]"

107.   Further, BD maintains a Trade Secret Policy that Hantle had access to during his employment with BD.  The BD Trade Secret Policy states that BD trade secrets may include, but need not be limited to information relating to "sales such as forecasts, promotional plans, call reports, competitive intelligence, or proprietary customer information (e.g., customer lists, pricing information; customer needs[.]"

108.   The Trade Secret Policy states that BD associates should treat all non-public information about BD as a BD trade secret unless otherwise instructed.

109.   Every BD associate with access to BD trade secrets shall comply with the BD Trade Secret Policy.

110.   BD requires its associates to complete C2C training on its Trade Secret Policy.

111.   Hantle most recently completed such training on November 20, 2024.

112.   During the course of Hantle's employment with BD, he completed more than a dozen training courses that discussed, among other things, protecting BD's information.

**E.    Hantle's Theft Of Confidential Information and Trade Secrets From BD**

113.   In or about October 2024, BD learned that Hantle had, in violation of his legal and contractual obligations to BD, transferred files containing BD business information by attaching at least one file containing BD information to an e-mail associated with his personal Yahoo account.

114.   As a result of this conduct and BD's subsequent investigation, on October 15, 2024, BD issued Hantle a warning (the "Warning").  A copy of the Warning is attached hereto as Exhibit 3.

115.   The Warning states: "You are receiving this email because BD Information Security has observed you uploading document(s) that contains BD-related information to a public storage domain or an unauthorized website."  *Id.*

116.   The Warning also reminded Hantle that "the use of public or personal e-mail, messaging, or any other external services (e.g., Internet-based e-mail, instant

messaging and file sharing services) to process or store BD information is prohibited[.]" *Id.*

117.  Despite receiving this warning in October 2024, approximately three (3) months later, in anticipation of his voluntary resignation from BD to join a competitor, Hantle (again) transferred BD trade secret and confidential information to his personal e-mail account.

118.  On or about January 22, 2025, Hantle informed BD of his intention to resign from BD effective February 6, 2025.  Specifically, on January 22, 2025, Hantle informed his manager of his intention to resign during a telephone call.

119.  During the January 22, 2025 call with his manager, Hantle's manager twice asked whether Hantle was going to a competitor, and Hantle unequivocally stated that he had not accepted an offer of employment with a competitor.

120.  Instead, Hantle represented to his manager that he had accepted a position in "software sales" and later in the conversation responded to his manager's inquiry that his new position is in "software" and that "its not related" to his work at BD.

121.  Hantle did inform his manager that his new position was in a Vice President capacity, and that he was pleased to regain a position in that capacity.

122.  In response to his manager's request, on January 23, 2025, Hantle sent an e-mail confirming his resignation from BD.

123.   About one week after Hantle's departure from BD, on February 11, 2025, Hantle's former manager had a call with Hantle regarding his resignation from BD.  During that call, Hantle's former manager, seeking to confirm that Hantle had not accepted employment with a competitor, asked Hantle to confirm that he would not see Hantle in the field, to which Hantle responded that his new position was "not the same thing."

124.   Following notice of his resignation, as part of its regular practices and procedures, BD discovered that in the days leading up to his resignation from the Company, Hantle had transferred trade secret and confidential information of the Company to his personal Yahoo e-mail account.

125.   Despite being warned by InfoSec about his inappropriate behavior only three months prior, on January 21, 2025, ***on the day before he gave notice to BD of his voluntary resignation to go to a direct competitor***, Hantle sent an e-mail to his personal e-mail account, brandonhantle@yahoo.com, that attached a PowerPoint presentation titled "Growth.pptx."

126.   The file transferred by Hantle contains BD trade secret and confidential information, including but not limited to: (i) BD's marketing strategies; (ii) BD's market potential, (iii) detailed revenue information relating to one of BD's customers; and (iv) BD's partners, consulting firms, and vendors.

127.   On the day before he tendered his resignation to BD, Hantle also printed at least two files from his company-issued laptop.

128.   Furthermore, on January 15, 2025, *one week before he gave notice of his resignation to BD*, Hantle e-mailed to his personal e-mail account a PowerPoint presentation titled "Diligent Robotics Moxi Business Plan.pptx". The e-mail sent to his personal e-mail account states: "Here is the investment opp who is trying to raise series C funds." A copy of the cover e-mail and first page of the PowerPoint presentation are attached hereto as Exhibit 4.

129.   The file was prepared for a company called "diligent robotics" by "Brandon Hantle Chief Revenue Officer". The title of the document is: "Business Plan & Strategy" and states "$30M+ ARR by 2025!" *Id.*

130.   The file transferred by Hantle contains BD trade secret and confidential information, including but not limited to: (i) BD's sales information; (ii) a confidential customer list, (iii) business plans; and (iv) sales processes.

131.   Slide 10 of the PowerPoint contains 'Maximizing Coverage & Sales Model' information, and contains BD sales information as well as BD's sales map.

132.   Slide 12 of the PowerPoint contains personnel information about the sales amounts for particular deals, including the amount of sales for each individual.

133.   Slide 14 epitomizes the brazen activity by Hantle in sending this PowerPoint and now possessing the information post-employment with BD. The

file contains the name of twenty-three (23) health systems who are customers of BD and have investment capabilities.

134.    Confirming that the information is both owned by BD and confidential information, Slide 14 of the PowerPoint is marked "BD Restricted".

135.    Slide 21 contains BD's confidential ninety (90) day business plan that contains BD's strategy for developing new business with clients and strategizing sales with existing BD clients.

136.    Slide 22 of the presentation contains BD's formal sales process, including confidential strategies for creating sales, advancing an active pipeline of sales, and closing sales deals.

137.    The information contained in the Diligent Robotics Moxi Business Plan highlights Hantle's intention to steal BD's trade secrets, convert them to his own, and use that information to compete with BD.

138.    Hantle's conduct in transferring such Company confidential and trade secret information on the eve of his announcement of his resignation could be for no legitimate business purpose; instead, he transferred the documents to use as part of his new employment at iA, to the detriment of BD.

139.    At the same time that the Company discovered that Hantle had transferred Company confidential information to his personal e-mail account in the

days before his resignation, the Company also learned that in August 2024, Hantle had transferred other documents to his personal Yahoo e-mail account.

140.   Specifically, BD learned that in or about August 2024, Hantle had transferred multiple files from his BD e-mail account to his personal e-mail account.

141.   Upon information and belief, Hantle's transfer of Company trade secret and confidential information in August 2024 coincided with the time period that he had begun to look for another job.

142.   The files that Hantle sent to his personal e-mail address in August 2024 contain confidential information of BD/Parata, including confidential forecasting information, sales strategies, prospecting strategies, and confidential customer information and customer contacts.

143.   On August 14, 2024, Hantle sent an e-mail with the Subject of "tools and resume" to his personal e-mail account.  A copy of the August 14, 2024 e-mail, without exhibits, is attached hereto as Exhibit 5.

144.   The title of Hantle's e-mail, "tools & resume", highlights Hantle's intention to not only search for a new job but that he intended to use the PowerPoint presentations (containing BD confidential information) as "tools" to use in connection with any new employment.

145.   In addition to attaching his resume, Hantle attached two files containing Company confidential information:

a.      The first file is a PowerPoint presentation with the title "The Moment is NOW".  The file contains trade secret and confidential information and is clearly marked "CONFIDENTIAL – FOR INTERNAL USE ONLY".  The file contains Company confidential information regarding the Company's: (i) sales process; (ii) operating model; and (iii) forecasting metrics.  The information contained within the file is not disclosed outside of the Company and is a Company trade secret; and

b.      The second file is a PowerPoint presentation with the title "BD Parata: Sales 101 – Health Systems Sales Strategies".  The file contains trade secret and confidential information and is also clearly marked "CONFIDENTIAL – FOR INTERNAL USE ONLY".  The file contains Company confidential information regarding the Company's: (i) business plan; (ii) business strategies; (iii) prospecting strategies; (iv) customer information and customer contact information; (v) sales process; (vi) operating model; and (vii) forecasting metrics.  The information contained within the file is not disclosed outside of the Company and is a Company trade secret.

146. Hantle also sent other files containing BD/Parata confidential information from his BD work e-mail account to his personal e-mail account in August 2024, all in violation of his Agreement and BD policy.

147. On August 21, 2024, at 5:46PM, Hantle sent another e-mail from his Company e-mail account to his personal Yahoo account that attached an additional three (3) files containing Company trade secrets and confidential information: (i) "Product and Competition Education Session AAEs.pptx"; (ii) "Training on Key Activities Driven Sales Pipeline Stages – June 2020.pptx"; and (iii) "Back to Basics Training.pptx":

    a. The first file is a PowerPoint presentation that contains competitive intelligence, a roadmap of the Company's pharmacy automation solutions products, and customer information of the Company. The information contained within the file is not disclosed outside of the Company and is a Company trade secret; and

    b. The second file contains Company confidential information relating to the Company's sales processes and sales strategies; and

    c. The third file contains Company confidential information relating to the Company's sales strategies and contains confidential customer information and customer contact information. The information

31

contained within the file is not disclosed outside of the Company and is a Company trade secret.

148.    Approximately one minute later, on August 21, 2024, at 5:47PM, Hantle sent an e-mail from his BD e-mail account to his personal Yahoo account that attached three (3) separate files containing Company trade secrets and confidential information:

a.    The first, "100 day plan.pptx" is a PowerPoint presentation that has as its title "ProEdge Rx Partners 100 Day Plan 'Transforming Healthcare'".  The presentation appears to be authored by a company known as ProEdge Rx Partners, and the first page identifies Hantle as ProEdge Rx Partners's Chief Revenue Officer.  The file, however, contains BD confidential information, and some of the slides are actually marked as "BD RESTRICTED", showing that the information contained within the slide is owned by the Company, not ProEdge Rx Partners.    The file contains Company confidential information regarding selling strategies, marketing strategies, strategic partnership strategies, and customer lists.  The information contained within the file is not disclosed outside of the Company and is a Company trade secret; and;

b.    The second file is a copy of the PowerPoint presentation titled "BD Parata: Sales 101 – Health Systems Sales Strategies" that Hantle had sent to his personal e-mail on August 14, 2024.  The file, which is marked "CONFIDENTIAL – FOR INTERNAL USE ONLY", contains Company trade secret and confidential information regarding the Company's: (i) business plan; (ii) business strategies; (iii) prospecting strategies; (iv) customer information and customer contact information; (v) sales process; (vi) operating model; and (vii) forecasting metrics. The information contained within the file is not disclosed outside of the Company and is a Company trade secret; and

c.    The third file is another PowerPoint presentation titled "BD Parata: Health Systems Call Points & Market Segmentation".  The file is also designated "CONFIDENTIAL – FOR INTERNAL USE ONLY", and contains Company trade secret and confidential information regarding the Company's: (i) business strategies; (ii) market drivers and market strategies; (iii) selling strategies and confidential selling statistics; and (iv) customer information and confidential information related to specific Company customers.  The information contained within the file is not disclosed outside of the Company and is a Company trade secret.

149.   By sending the "100 day plan.pptx" file to his personal e-mail account, Hantle, *while employed by BD and earning a salary from BD*, stole Company trade secret and confidential information, and converted it into a presentation to make it appear that it was owned by a separate company in which Hantle represented he was the Chief Revenue Officer.

150.   By misappropriating the Company's trade secrets and confidential information, Hantle intends to use the information for his own benefit and/or the benefit of third parties, as well as to damage the Company.

151.   On August 23, 2024, Hantle sent an e-mail from his BD e-mail account to his personal Yahoo account with the Subject "tools to sell and training" that attached two (2) separate files containing Company trade secrets and confidential information:

a.   The first file is another copy of the PowerPoint presentation titled "BD Parata: Sales 101 – Health Systems Sales Strategies" that Hantle had sent to his personal e-mail on August 14, 2024 and August 21, 2024.  The file, which is marked "CONFIDENTIAL – FOR INTERNAL USE ONLY", contains Company trade secret and confidential information regarding the Company's: (i) business plan; (ii) business strategies; (iii) prospecting strategies; (iv) customer information and customer contact information; (v) sales process; (vi) operating model; and (vii) forecasting metrics.  The

information contained within the file is not disclosed outside of the Company and is a Company trade secret; and

b. The second file is another PowerPoint presentation titled "BD Parata: Health Systems Call Points & Market Segmentation". The file is also designated "CONFIDENTIAL – FOR INTERNAL USE ONLY", and contains Company trade secret and confidential information regarding the Company's: (i) business strategies; (ii) market drivers and market strategies; (iii) selling strategies and confidential selling statistics; and (iv) customer information and confidential information related to specific Company customers. The information contained within the file is not disclosed outside of the Company and is a Company trade secret.

**F.    iA is a Direct Competitor of BD**

152.   BD is a global leader in the pharmacy automation market in which it sells and services high-speed bulk oral solid medication pouch packaging devices.

153.   BD offers its clients a variety of products and packages, including Blister Packages, Pouch Packages, Will Call Solutions, and Controlled Substances Management Solutions.

154.   Through the use of automation and advanced software, pharmacists can focus more of their time on higher value clinical work and patient interactions to help improve medication adherence, medication safety and patient outcomes.

155.   iA is a company that maintains its national headquarters in Binghamton, New York.

156.   iA offers pharmacy automation solutions products that directly compete with the pharmacy automation solutions products offered by BD.  Thus, iA is a direct competitor of BD.

157.   Both BD and iA market their pharmacy automation solutions products to commercial retail pharmacies, health systems, and government pharmacies.

158.   Upon information and belief, BD and iA market competing products in the pharmacy automation solutions space, including but not limited to: (i) centralized fulfillment solutions and related enterprise software for managing the fulfillment process; (ii) community pharmacy fulfillment solutions; (iii) will call and controlled substance inventory management solutions; and (iv) pouch and/or blistercard packaging solutions.  *See* https://iarx.com/health-systems/ (stating that iA's pharmacy fulfillment platform solutions for health systems include: (a) centralized pharmacy fulfillment; (b) community pharmacy fulfillment; and (c) shared central fulfillment).

159.   BD and iA regularly bid against each other for clients in the pharmacy automation solutions space.

160.   Hantle knows the bidding structure for all BD pharmacy solutions products that compete with iA, and, therefore, if he is allowed to continue

employment with iA in a similar position to the one he most recently held with BD, it will place Hantle and iA in an unfair competitive advantage vis-à-vis BD.

161.   To that end, prior to his resignation from BD to join a direct competitor, Hantle was intimately involved in several important deals, in which iA is currently bidding against BD, of which Hantle possesses confidential BD bidding information, competitive intelligence, pricing information, and other BD confidential information.

162.   Hantle also has intimate knowledge of BD's confidential pricing metrics, pricing methods, and tiered pricing, and, therefore, if he is allowed to continue employment with iA in a similar position to the one he most recently held with BD, it will place Hantle and iA in an unfair competitive advantage against BD.

## G.    Hantle's Resignation And Breach Of His Restrictive Covenants

163.   On or about January 22, 2025, Hantle informed BD of his intention to resign from BD effective February 6, 2025.

164.   Upon notifying BD of his intention to resign, BD asked Hantle to identify his new employer, in response to which Hantle misrepresented to BD that he would be working in "software sales" in order to conceal that he had accepted an offer of employment with a direct competitor of BD.

165.   On that same day, Hantle's manager spoke with Hantle and asked where he had accepted new employment, to which Hantle responded and stated that he was going to  another company that was "<u>not</u> a competitor" of BD.

166.   Hantle also informed his manager that he would be working in "software sales" and that he was "leaving on great terms[.]"

167.   Hantle's statements to his manager about his new employment were misrepresentations in order for BD to believe that Hantle was not taking a competitive role to BD.

168.   After his departure from BD, on February 11, 2025, Hantle again misrepresented to BD that he had not taken a competitive role.

169.   In actuality, Hantle accepted a role that is directly competitive to BD, and in doing so, he misappropriated BD's trade secrets and confidential information, thereby establishing his intent to use and/or disclose those documents during his employment with iA.

170.   On February 21, 2025, BD sent Hantle a letter reminding him of his confidentiality obligations to BD and requesting that he complete and return an Exit Certification to BD no later than March 3, 2025.  A copy of BD's February 21, 2025 correspondence is attached hereto as Exhibit 6.

171.   BD informed Hantle that it "has grave concerns about your deception and apparent misappropriation of its confidential information and trade secrets." *Id.*

172.   BD also explained that his voluntary resignation occurred shortly after he had improperly uploaded files containing BD Proprietary Information to a personal account.

173.   On or about March 2, 2025, Hantle returned to BD the Exit Certification.  A true copy of the Exit Certification returned to BD is attached hereto as Exhibit 7.

174.   Other than signing and dating the Exit Certification on February 28, 2025, Hantle only identified his new employer as iA but did not respond to BD's other requests.  (*See* Exhibit 7, at ¶ 5(a)).

175.   Hantle ignored BD's request that he provide a description of his role with iA or what efforts he would take to prevent misuse of BD's confidential information.  (*See id.* at ¶ 5).

176.   Hantle certified that he had not saved, retained "transferred or transmitted in any form whatsoever any Protected Information" (as defined in the Exit Certification) whether in physical form or electronically stored.  (*Id.* at ¶ 3).

177.   It is BD's understanding that Hantle's statement in Paragraph 3 of the Exit Certification is false because BD is aware that he transferred at least two files containing Company confidential information to his personal e-mail account in the days leading up to his voluntary resignation; however, Hantle has neither disclosed this conduct to BD nor returned the files to BD.

178.   Hantle is presently employed by iA as its Senior Vice President, Sales, and is a member of iA's Leadership Team.  (*See* https://iarx.com/ia-leadership/).

179.   Upon information and belief, Hantle's responsibilities with iA are the same or substantially similar to Hantle's responsibilities that he had while employed at BD.

180.   As a result of being in an executive sales role at iA, Hantle has a financial incentive to use BD's confidential and trade secret information to the advantage of him and iA to increase sales.

181.   Hantle's employment with iA as a Senior Vice President, Sales would violate the his non-compete with the Company that prohibits Hantle from accepting employment with a competitor "that develops, manufactures or markets any products, or performs any services, that are otherwise competitive with or similar to the products or services of the Company[.]"  (Exhibit 1, at ¶ 8).

182.   In addition to breaching his non-compete, Hantle has already breached his non-solicit covenant with the Company.

183.   On or about March 6, 2025, a BD Account Executive informed BD that he was recruited by Hantle to leave BD and join iA, stating that Hantle was attempting to put "together a great team" with iA.

184.   The BD Account Executive further informed BD that Hantle may be recruiting other BD employees to leave BD's employ to join iA.

185.    Most concerning, Hantle informed the BD Account Executive that Hantle intends to "take all the Health System business from Parata."

186.    As he possesses all of the BD pipeline account information, BD would be severely damaged if Hantle is allowed to continue in his current role at iA.

187.    In addition to violating his confidentiality and non-compete obligations to the Company, Hantle has violated his contractual obligations not to solicit Company employees and is also violating his customer non-solicit by seeking to "take all the Health System business from Parata."

188.    Hantle's plan to steal the Company's "Health System business" is consistent with his misappropriation of BD trade secrets, including his theft of the Company's Health Systems Sales Strategies file discussed at Paragraphs 145(b), 148(b), and 151(a), above.

## H.    BD's Injuries

189.    By disregarding his restrictive covenants and commencing employment with a direct competitor in a similar position to the one he most recently held at BD, after stealing BD's trade secrets, Hantle has placed BD in an untenable position. Relief is now essential to protect BD's valuable confidential and proprietary information as well as its customer relationships.

190.    As a result of Hantle's intimate knowledge and access to information concerning BD's strategies, especially concerning customer contacts, pricing and

pricing strategies related to BD's pharmacy automation solutions products -- the very same platform where iA competes with BD -- it is unavoidable and inevitable that Hantle will use his vast knowledge of BD's confidential and proprietary information, including the confidential information that he stole from BD, in his new position at iA, including but not limited to using information regarding BD's pipeline accounts to unfairly compete with BD.

191.   Should Hantle be permitted to continue employment at iA, he will do so armed with the strategic pricing strategies, confidential customer information, and other highly confidential information related to BD's pharmacy automation solutions products while working for a competitor that is in the same field as BD.  In the process, by employing Hantle, iA will usurp the substantial time and resources BD invested in developing its pricing strategies and maintaining its customer relationships.

192.   At the present time, BD and iA compete fairly in a competitive market, but if Hantle is allowed to continue his employment with iA, it will provide iA an advanced knowledge of BD's overall strategy, and therefore give iA an unfair advantage for control of the wealth management services market.

193.   By stealing BD's trade secret and confidential information, Hantle has exhibited evidence that he will use and/or disclose BD's confidential information and trade secrets while employed at iA.

194.   BD will suffer irreparable harm if Hantle is allowed to continue employment with BD because, in addition to all of the confidential pricing information and strategies Hantle had access, he also possesses BD's confidential sales strategies that he stole from BD shortly before his resignation and in anticipation of his employment with iA.

195.   In the hands of a competitor, such as iA, Hantle will disclose or use such information to enable iA to outbid BD on any pricing proposals.

196.   BD will suffer irreparable harm because Hantle, as an employee of iA in a similar position to the one he most recently held at BD, will use the confidential pricing information and pricing strategies he learned while an employee of BD to unfairly compete with BD on behalf of iA, and he will leverage his knowledge of BD's customers to outbid BD on pricing and renewals to benefit himself and iA.

197.   BD cannot estimate with any degree of certainty the nature and extent of its potential damages to be incurred as a direct consequence of Hantle's breach of his continuing obligations to BD. As such, the damages and injuries threatened by reason of the intentional actions of Hantle are irreparable and BD has no adequate remedy at law to protect itself from Hantle's wrongful activities.

198.   Indeed, when Hantle executed the Agreement, he acknowledged that if he were to breach the Agreement, the Company will suffer "substantial and

irrevocable damage" and that the Company "will be entitled to specific performance and other injunctive relief, without the posting of a bond."   Exhibit 1, at ¶ 10.

## FIRST CAUSE OF ACTION

### (Misappropriation/Threatened Misappropriation of Trade Secrets under the Defend Trade Secrets Act of 2016)

199.   BD repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

200.   BD owned and possessed certain confidential, proprietary and trade secret information, as alleged above.   The BD trade secrets are the products of valuable research and development, time and effort, and investment by BD.

201.   This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

202.   The Company has taken reasonable measures to keep such information secret and confidential, including but not limited to requiring employees to sign Employee Agreements and implementing employment policies aimed at protecting confidential information (including but not limited to the BD Trade Secret Policy).

203.   This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

204.   In violation of BD's rights, Hantle misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein, within the meaning of the DTSA, 18 U.S.C. 1836, by obtaining, using and disclosing the BD Trade Secrets and continuing to use and disclose them for their own economic benefit.

205.   The trade secret information accessed and stolen by Hantle includes (but is not limited to) each file identified in paragraphs 124 through 151, above.

206.   Hantle's misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

207.   If Hantle's conduct is not remedied, and if Hantle is not enjoined, Hantle will continue to misappropriate, disclose, and use for his own benefit and to BD's detriment, BD's trade secret information.

208.   As the direct and proximate result of Hantle's conduct as aforesaid, BD has suffered and, if Hantle's conduct is not stopped, BD will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

209.   Because BD's remedy at law is inadequate, BD seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests. BD's business is reliant on its business reputation and its ability

to maintain and grow its client base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

210.  BD has a substantial likelihood of success on the merits because of Hantle's blatant, willful, and malicious misappropriation of trade secrets through the improper and unlawful methods, as alleged herein.

## SECOND CAUSE OF ACTION

**(Misappropriation of Trade Secrets in Violation of the New Jersey Trade Secrets Act, N.J.S.A. § 56:15-1 *et seq*.)**

211.  BD repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

212.  BD owned and possessed certain confidential, proprietary and trade secret information, as alleged above.

213.  BD has taken reasonable measures to keep such information secret and confidential.

214.  This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

215.  This confidential, proprietary, and trade secret information was made accessible to Hantle by virtue of his confidential employment relationship with BD.

216.   In violation of BD's rights, and in breach of his contractual obligation to maintain secrecy, Hantle misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein, in violation of N.J. Stat. Ann. § 56:15-1 et seq.

217.   The trade secret information accessed and stolen by Hantle includes (but is not limited to) each file identified in Paragraphs 124 through 151, above.

218.   Hantle's misappropriation of the confidential, proprietary and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

219.   Hantle's intentional and malicious intent to misappropriate BD's confidential and trade secret information is further evinced by the fact that after he was warned by InfoSec about his improper transfer of files in 2024, Hantle nevertheless transferred files containing trade secret information of BD/Parata to his personal e-mail account shortly before tendering his voluntary resignation to BD. The foregoing facts also indicate Hantle's intent to use and/or disclose this confidential, proprietary, and trade secret information.

220.   Hantle's continued possession of BD's trade secrets places him in a position to use or disclose such information.

221.   The information taken by Hantle would provide invaluable competitive information to any skilled third party in the field, such as iA, to use such information to unfairly compete with BD.

222.   Upon information and belief, Hantle has engaged, and continues to engage, in the uncured misappropriation and unauthorized possession, use and/or disclosure of BD's confidential, proprietary and trade secret information, in violation of his obligations under the Agreement and New Jersey law.

223.   Upon information and belief, the proprietary, and trade secret information stolen by Hantle will be disclosed to BD's competitors, including iA with knowledge of Hantle's breach of his confidential obligations to BD.

224.   If Hantle's conduct is not remedied, and if Hantle is not enjoined, he will continue to misappropriate, disclose, and use for his own benefit and to BD's detriment, BD's trade secret information.

225.   As the direct and proximate result of Hantle's conduct as aforesaid, BD has suffered and, if Hantle's conduct is not stopped, BD will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

226.   Because BD's remedy at law is inadequate, BD seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and other legitimate business interests. BD's business is reliant on its business reputation and its ability

to maintain and grow its client base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

227.  BD has a substantial likelihood of success on the merits because of Hantle's blatant, willful, and malicious misappropriation of trade secrets through the improper and unlawful methods, as alleged herein.

## **THIRD CAUSE OF ACTION**

### **(Misappropriation of Trade Secrets in Violation of the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101 *et seq.*)**

228.  BD repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

229.  BD owned and possessed certain confidential, proprietary and trade secret information, as alleged above.

230.   The Company has taken reasonable measures to keep such information secret and confidential.

231.  This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

232.   This confidential, proprietary, and trade secret information was made accessible to Hantle by virtue of his confidential employment relationship with BD.

49

233.   In violation of BD's rights, and in breach of his contractual obligation to maintain secrecy, Hantle misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein, in violation of C.R.S. § 7-74-101 et seq.

234.   The trade secret information accessed and stolen by Hantle includes (but is not limited to) each file identified in Paragraphs 124 through 151, above.

235.   Hantle's misappropriation of the confidential, proprietary and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

236.   Hantle's intentional and malicious intent to misappropriate BD's confidential and trade secret information is further evinced by the fact that after he was warned by InfoSec about his improper transfer of files in 2024, Hantle nevertheless transferred files containing trade secret information of BD/Parata to his personal e-mail account shortly before tendering his voluntary resignation to BD. The foregoing facts also indicate Hantle's intent to use and/or disclose this confidential, proprietary, and trade secret information.

237.   Hantle's continued possession of BD's trade secrets places him in a position to use or disclose such information.

238.   The information taken by Hantle would provide invaluable competitive information to any skilled third party in the field, such as iA, to use such information to unfairly compete with BD.

239.   Upon information and belief, Hantle has engaged, and continues to engage, in the uncured misappropriation and unauthorized possession, use and/or disclosure of BD's confidential, proprietary and trade secret information, in violation of his obligations under the Agreement and New Jersey law.

240.   Upon information and belief, the proprietary, and trade secret information stolen by Hantle will be disclosed to BD's competitors, including iA with knowledge of Hantle's breach of his confidential obligations to BD.

241.   If Hantle's conduct is not remedied, and if Hantle is not enjoined, he will continue to misappropriate, disclose, and use for his own benefit and to BD's detriment, BD's trade secret information.

242.   As the direct and proximate result of Hantle's conduct as aforesaid, BD has suffered and, if Hantle's conduct is not stopped, BD will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

243.   Because BD's remedy at law is inadequate, BD seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and other legitimate business interests. BD's business is reliant on its business reputation and its ability

to maintain and grow its client base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

244.   BD has a substantial likelihood of success on the merits because of Hantle's blatant, willful, and malicious misappropriation of trade secrets through the improper and unlawful methods, as alleged herein.

## FOURTH CAUSE OF ACTION

### (Breach of Contract – Proprietary Information)

245.   BD repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

246.   As a condition of his employment relationship with BD, Hantle agreed to a covenant of confidentiality to protect BD's Proprietary Information (as defined in the Agreement), and not to engage in acts or omissions that could result in wrongful disclosures.  This covenant is contained in the Agreement executed by Hantle on April 25, 2018.  *See* Exhibit 1, at ¶ 1.

247.   Hantle agreed that he would not use or disclose any Proprietary Information for any purpose other than the performance of his duties for the Company.  *See* Exhibit 1, at ¶ 2.

248.   Hantle also agreed that he would return to the Company all "Proprietary Information in my possession or control upon the earlier of a request by the Company or termination of my employment."  *Id.*

249.   The Company performed all of its obligations pursuant to the Agreement.

250.   Hantle breached the covenant of confidentiality in the Agreement by accessing BD's confidential and trade secret information and by transferring that information to his personal Yahoo e-mail account shortly before informing BD of his intention to resign from the Company.

251.   Additionally, Hantle breached Paragraph 2 of the Agreement by failing to return the files he stole, yet certifying that he does not possess any BD confidential information.

252.   Hantle's continued possession of BD's trade secrets and Proprietary Information places him in a position to use or disclose such information.  This is particularly so given Hantle's current employment with iA, a direct competitor of BD.

253.   As the direct and proximate result of Hantle's conduct as aforesaid, BD has suffered and, if Hantle's conduct is not stopped, BD will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

254.   BD has been damaged by these breaches for which it seeks damages and injunctive relief as more particularly set forth below.

## FIFTH CAUSE OF ACTION

### (Breach of Contract – Non-Competition and Non-Solicitation)

255.    BD repeats and realleges the allegations in preceding paragraphs of this Complaint as if set forth fully herein.

256.    The Agreement is a valid, enforceable contract entered into between the Company and Hantle.

257.    The Company has performed all of its duties and obligations under the Agreement.

258.    Hantle has materially breached the non-competition covenant contained within the Agreement by commencing competitive employment with iA in a similar position to the position he most recently held at BD.

259.    Hantle has materially breached the customer non-solicitation covenant contained within the Agreement by commencing competitive employment with iA and possessing BD's confidential customer lists and contact information.

260.    Hantle has materially breached the customer non-solicitation covenant contained within the Agreement by actively seeking to take away BD's customers and have them become customers of iA.

261.    Hantle has also materially breached the employee non-solicitation covenant contained within the Agreement by actively recruiting current BD employees to leave BD's employ and accept employment with iA.

262.   Hantle's breach of contract has caused, and will continue to cause, BD to suffer substantial injury that cannot be calculated, and irreparable harm to its business as he specifically acknowledged and agreed.

## SIXTH CAUSE OF ACTION

### (Breach of the Duty of Loyalty)

263.   BD repeats and realleges the allegations contained in the preceding paragraphs of the Complaint as though fully set forth herein.

264.   As an employee of BD, Hantle had a duty of loyalty to BD to act in BD's interests.

265.   As an employee of BD, Hantle had a duty to return and not disclose BD's confidential information while he was employed by BD.

266.   Hantle breached the duty of loyalty he owed to BD by stealing BD's confidential sales information and other confidential information while still employed by BD and using such information to his benefit and to the detriment of BD.

267.   As an employee of BD, Hantle had a duty not to injure BD's business.

268.   Hantle breached the duty of loyalty he owed to BD by stealing BD's sales information and other confidential information and then subsequently misrepresenting to BD that he did not possess any confidential information of the Company.

269.   BD has suffered damages proximately caused by Hantle's breaches of her duty of loyalty.

270.   The motivation behind the breaches of Hantle's duty of loyalty that he owes to BD is Hantle's incentive to perform at his new employer, iA, a direct competitor of BD.

271.   By the conduct described above and realleged, Hantle violated those duties, and instead acted in his own interests and contrary to the interests of BD.

272.   Hantle's actions breached the duty of loyalty owed to BD and has damaged BD.

### SEVENTH CAUSE OF ACTION
#### (Conversion)

273.   BD repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

274.   Hantle has intentionally and unlawfully exercised dominion over property owned by BD, including but not limited to its confidential trade secrets and information, as well as its laptop computer.

275.   Hantle's conduct constitutes a conversion of BD's property.

276.   Hantle's acts of conversion were committed willfully, knowingly, maliciously, and in conscious disregard of her legal obligations to BD.

277.   Hantle's conduct has caused BD injury to its property and business.

278.   Because BD's remedy at law is inadequate, BD seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and other legitimate business interests. BD's business is reliant on its business reputation and its ability to maintain and grow its client base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**WHEREFORE**, plaintiff BD respectfully demands that this Court enjoin Hantle from continuing the unlawful activities described above, and that this Court issue judgment as follows:

1.   An Order requiring that Hantle provide to BD any and all BD/Parata documents or files in his possession or control;

2.   An Order requiring that Yahoo preserve all electronic mail for any and all e-mail accounts owned by Hantle (including brandonhantle@yahoo.com) and that Hantle be ordered to allow for a forensic review of each e-mail account and cloud storage account by an independent computer expert approved by the Court;

3.   Temporary, preliminary, and permanent injunctive relief restraining Hantle from further misappropriating or using BD trade secrets;

4.   That Hantle is temporarily, preliminarily and permanently:

a.  restrained from keeping, retaining, transmitting, possessing or in any way using, disclosing or having continuing access to BD documents or information;

b.  required to provide to BD, and allow BD to seize, freeze and examine any and all communications devices, computers or other electronic devices of Hantle to assure that he is not keeping, retaining, transmitting, possessing or in any way using, disclosing or having continuing access to BD documents or information and to determine with whom such documents or information have been shared or disclosed;

c.  required to provide BD's or its designated agents access to, and the right to inspect, any and all computers or other electronic device that now contain or ever contained BD's documents or information;

d.  required, other than as provided in subparagraph (e), to refrain from altering, discarding, destroying or otherwise changing any and all computers or other electronic devices or email or other accounts or storage media of any kind or character that now contain or ever contained BD's documents or information, and must preserve same for future inspection;

      e.  required to provide BD, and BD's counsel, with a document in a form acceptable to BD and to any relevant Yahoo storage provider or email account provider authorizing the removal and deletion from such account or service any and all emails and attachments containing BD documents or information;

5. Temporarily restraining Hantle from engaging in any conduct in violation of the non-competition and non-solicitation covenants in his Agreement, including (without limitation): (i) a prohibition against Hantle competing against BD by continuing employment with iA; (ii) Hantle's use of BD's confidential information; and (iii) the solicitation of BD's customers or employees in violation of the Agreement;

6. Preliminarily and permanently enjoining Hantle from engaging in any conduct in violation of the non-competition and non-solicitation covenants in his Agreement, including (without limitation): (i) a prohibition against Hantle competing against BD by continuing employment with iA; (ii) Hantle's use of BD's confidential information; and (iii) the solicitation of BD's customers or employees in violation of the Agreement;

7. Compensatory, consequential and incidental damages;

8.  Punitive or exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), N.J.S.A. § 56:15-4(b), C.R.S. § 7-74-101 *et seq.*, and/or other applicable law;

9.  Reasonable attorney's fees and costs of suit pursuant to 18 U.S.C. § 1836(b), N.J.S.A. § 56:15-6, Paragraph 10 of the Agreement, and/or other applicable law;

10. For the immediate return of all BD property taken, including any and all documents or other means of information storage containing BD property and confidential information;

11. Pre-judgment and post-judgment interest on that award; and

12. Granting BD such other and further relief as is just and proper.

Dated:  March 12, 2025

By:    ____ /s *Daniel R. Levy*_____
Daniel R. Levy, Esq.
Epstein Becker & Green, P.C.
One Gateway Center, 13th Floor
Newark, NJ  07102
Phone: 973.642.1900 / Fax 973.642.0099
E-mail:    dlevy@ebglaw.com

Attorneys for Plaintiff
*Becton, Dickinson and Company*

## <u>CERTIFICATION UNDER L.CIV.R 11.2</u>

This matter in controversy is not the subject of another action pending in any court, or any other pending arbitration or administrative hearing.


Dated:  March 12, 2025                    EPSTEIN BECKER & GREEN, P.C.


By:    /s *Daniel R. Levy*_____
Daniel R. Levy, Esq.
Epstein Becker & Green, P.C.
One Gateway Center, 13th Floor
Newark, NJ  07102
Phone: 973.642.1900 / Fax 973.642.0099
E-mail:      dlevy@ebglaw.com

Attorneys for Plaintiff
Becton, Dickinson and Company

61

## **VERIFICATION**

I, Chris Spriggs, hereby verify and certify under 28 U.S.C. §1746 to the following:

1.      I am the Vice President West, for Becton, Dickinson and Company's ("BD") Medication Management Solutions business.

2.      I have read the Verified Complaint.  No single individual has personal knowledge of each and every fact contained therein.  I have, however, reviewed the allegations therein.  The allegations in the Verified Complaint are, based on my information and belief as informed by company documents and records and my own personal knowledge, true to the best of my knowledge, information, and belief.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: March 12, 2025                              _____
                                                                        *Chris Spriggs*
                                                                        Chris Spriggs